**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| A SPECIAL TOUCH, | : | No. 30 MAP 2019 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court dated August |
| | : | 23, 2018, at No. 1181 CD 2016, |
| v. | : | Affirming in Part and Reversing in |
| | : | Part the final decision and order of |
| | : | the Department of Labor and |
| COMMONWEALTH OF PENNSYLVANIA, | : | Industry, dated June 16, 2016, at |
| DEPARTMENT OF LABOR AND | : | No. 14-R-0327-4. |
| INDUSTRY, OFFICE OF | : | |
| UNEMPLOYMENT COMPENSATION TAX | : | ARGUED:  November 20, 2019 |
| SERVICES, | : | |
| | : | |
| Appellant | | |


**OPINION**


**JUSTICE BAER**                                        **DECIDED:  April 22, 2020**

This discretionary appeal calls on us to discern the meaning of the phrase "customarily engaged" as used in Subsection 4(l)(2)(B) of the Unemployment Compensation Law (Law), 43 P.S. § 753(l)(2)(B) (defining "employment" to include "[s]ervices performed by an individual for wages" unless, *inter alia*, "as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business").[1]  In particular, we must determine whether the phrase requires

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*.  Subsection 4(l)(2)(B) of the Law provides more fully as follows:

Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is shown to the

an individual to be involved in an independently established trade, occupation, profession, or business in actuality, as opposed to having the mere ability to be so involved. For the reasons that follow, we conclude that the phrase "customarily engaged" as used in Subsection 4(l)(2)(B) mandates that an individual actually be involved in an independently established trade, occupation, profession, or business. Because the Commonwealth Court reached a contrary conclusion, we respectfully reverse the order of that court.

## I. Background

A Special Touch (Salon) is a sole proprietorship owned by Colleen Dorsey (Owner) offering nail, skin, massage, and permanent cosmetic services. On August 26, 2014, following an audit, the Department of Labor and Industry (Department), Office of Unemployment Compensation Tax Services (OUCTS) issued a Notice of Assessment to the Salon indicating that it owed unemployment compensation (UC) contributions and interest in the amount of $10,647.93 for the period of 2010 through the second quarter of 2014. This assessment was based on OUCTS's determination that ten individuals providing work for the Salon had been misclassified as independent contractors rather than employees of the Salon, thus subjecting it to the UC taxes.[2] The Salon filed a petition for reassessment and a hearing was conducted on the matter.

---

satisfaction of the department that--(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business.

43 P.S. § 753(l)(2)(B).

[2] *See generally* 43 P.S. § 781 (explaining, *inter alia*, that "[e]ach employer shall pay contributions [at various rates equal to certain percentages] of wages paid by him for employment").

Following the hearing, OUCTS agreed that sufficient information had been provided to show that three of the ten individuals included in the assessment--a cosmetologist and two individuals who provided occasional cleaning and babysitting services--were independent contractors. Thus, those individuals were removed from the assessment. This left seven individuals in dispute, five of whom are the subject of this appeal: two nail technicians, identified below as V.D. and S.M., and three other individuals who provided cleaning, maintenance, and/or babysitting work, identified below as G.S., C.S., and B.G. (hereinafter "cleaning personnel").[3]

Upon further review, the Department rendered its final decision concluding that all five workers were employees of the Salon under Subsection 4(l)(2)(B) of the Law. Beginning with its findings of fact pertaining to the nail technicians, the Department determined that V.D. started working at the Salon in 2011, while S.M., who was Owner's sister, worked at the Salon during each of the years covered by OUCTS's audit.[4] There was no written contract between the nail technicians and the Salon. The Department further found that the nail technicians operated under Owner's business name; their names did not appear on the Salon door or sign, and neither of them had business cards. The Department also found that the nail technicians appeared on the Salon's website under the headings "Our Team" and "Our trained and friendly staff," and their services were advertised on the Salon's brochure. Final Decision and Order of the Department, 6/16/2016, at page 12, Finding of Fact (F.F.) 79; page 31.

---

[3] The other two disputed workers were massage therapists, whom the Department ultimately determined to be independent contractors. As noted, their status is not contested before this Court.

[4] The Department made 85 findings of fact. The above summary includes those facts the Department found to be most relevant in analyzing the second prong of Subsection 4(l)(2)(B) at issue here, as well as others that we have included for purposes of providing a fuller factual background of this matter.

Additionally, the Department determined that the nail technicians were responsible for maintaining their professional licenses, and that they provided their own supplies and equipment. The nail technicians had their own stations at the Salon and keys to the facility. The Department found that the nail technicians set their own schedules and communicated with clients through use of their personal cell phones, though the Salon's computer and phone were used for scheduling purposes as well. Further, the nail technicians' clientele consisted mostly of prior or longstanding clients who arranged regular appointments.

The Department also found that the nail technicians were paid under a "lease the space out" split-pay arrangement, with 60% of client payments going to the nail technicians and 40% going to the Salon as a "lease fee" to cover overhead. *Id.* at pages 3-4, F.F. 10; page 10, F.F. 60; Page 11, F.F. 70. Prices for services were generally agreed upon between Owner and the nail technicians, and the technicians could charge for additional services not listed on the Salon's price sheet. Additionally, the Department determined that client payments were made to the Salon, with the nail technicians and Owner maintaining records of transactions for purposes of figuring out the 60/40 pay split. The Salon collected payments and paid workers weekly, biweekly, or semimonthly without withholdings.[5] The Department determined that V.D. made $626.00 from her efforts at the Salon in 2011; $15,773.14 in 2012; $16,652.10 in 2013; and $6,114.57 in 2014. As to S.M., the Department determined that she worked one or two days a week and averaged about $200 a week from activities within the Salon.

As for work performed outside of the Salon, the Department found that, "[a]t the very beginning" of her time working at the Salon, V.D. also worked at another location, until her arrangement at that other facility ended. *Id.* at page 10, F.F. 59. The Department

---

[5] Tips were paid directly to the nail technicians unless added to the credit card charge.

also determined that, while S.M. did some home visits "a while ago" when a client had surgery, she did not do them regularly and had never worked at another salon. *Id.* at page 11, F.F. 66, 68. She characterized her work at the Salon as something she did as a "side" activity. *Id.* at page 12, F.F. 74. She formerly worked as a server at Cracker Barrel and the VFW.

With respect to the cleaning personnel, the Department observed that G.S. performed part-time cleaning and maintenance work directly and indirectly related to the Salon in 2013, while C.S. and B.G. helped Owner with her children and performed cleaning duties.[6] As with the nail technicians, there was no written contract between the cleaning personnel and the Salon. The Department further found that all three cleaning personnel were paid an hourly rate that was either agreed upon between the individual and the Salon or set by the individual, and the cleaning personnel either set their own hours or otherwise worked based on their own availability and what Owner needed.

C.S. worked anywhere from one to four days a week, B.G. worked up to two days a week, and G.S. would come into the Salon a couple of days a week for a couple of hours. The Department also determined that all three cleaning personnel performed work outside of the Salon: G.S. worked at an M&M factory and picked up unspecified "odds and ends" jobs; C.S. was a college student who also worked at Red Robin and "possibly someplace else;" and B.G. also worked for a temp agency. *Id.* at page 8, F.F. 44, 47; page 10, F.F. 57; page 28. The Salon provided a vacuum cleaner, washer and dryer, and cleaning supplies for the cleaning personnel.

---

[6] The Department did not make a specific finding as to when C.S. worked for the Salon, but it found that he made $3,124.55 in 2012 and $296.00 in the first quarter of 2013. B.G. worked for the Salon during the third quarter of 2012. Both G.S. and B.G. made less than $1,000 during their time at the Salon.

Turning to its analysis of whether these individuals satisfied Subsection (4)(l)(2)(B) of the Law, the Department first determined that all five individuals were free from the Salon's direction or control for purposes of that provision's first prong.[7]  *See* 43 P.S. § 753(l)(2)(B) (requiring that an individual "has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact").  The Department continued, however, by concluding that the five individuals were not "customarily engaged in an independently established trade, occupation, profession or business," thus failing to satisfy the second prong.

The Department began its examination of whether the five disputed individuals were "customarily engaged in an independently established trade, occupation, profession or business" by setting forth a three-part test gleaned from this Court's decision in *Danielle Viktor, Ltd. v. Dep't of Labor & Indus.*, 892 A.2d 781 (Pa. 2006):  (1) whether the individuals were able to work for more than one entity; (2) whether the individuals depended on the existence of the putative employer for ongoing work; and (3) whether the individuals were hired on a job-to-job basis and could refuse any assignment.[8]  In addition to this three-part test, the Department noted the following other considerations it gathered from *Viktor* that factored into the analysis under the second prong of Subsection 4(l)(2)(B): (1) whether the business of the individuals was a business unit or other component of the putative employer's business; (2) whether the business of the individuals was connected in a subordinate manner to the putative employer's business; (3) whether the individual workers could substitute other workers of their own choice when they decided not to complete a job assignment; and (4) whether the individual owned the assets of or bore the financial risk for the enterprise.

---

[7] This aspect of the Department's determination is not at issue in this appeal.

[8] We discuss *Viktor* in more detail *infra* at pages 19-20.

The Department also observed that the Commonwealth Court's decision in *Minelli v. Unemployment Comp. Bd. of Review*, 39 A.3d 593 (Pa. Cmwlth. 2012) "adds [to these other considerations] that the individual or claimant be 'customarily engaged in such trade or business in order to be considered self-employed,' as opposed to being engaged in isolated or sporadic jobs."[9]  Final Decision and Order of the Department, 6/16/2016, at 31 (quoting *Minelli*, 39 A.3d at 598).

The Department applied the above considerations to the disputed workers and, though it acknowledged that this was a "close case," concluded that, on balance, they supported a finding of an employment relationship as to all five individuals under the second prong of Subsection 4(l)(2)(B).  *Id.* at 33.  In doing so, the Department reasoned that all of the individuals were able to perform services for more than one entity, as there was no written contract between the individuals and the Salon containing restrictive covenants, and there was nothing to suggest that the hours the individuals worked for the Salon, which Owner did not set, limited them in this respect.  The Department also concluded that all of the disputed workers could refuse assignments and that C.S. and B.G. were hired by the job, though the record was ambiguous as to G.S., and the nail technicians were not.

The Department further observed that certain other considerations slightly favored an employment relationship as to the nail technicians, though that was "less so" in the case of the cleaning personnel because they "performed work that squarely d[id] not fall within the course of [the Salon]'s trade or business."  *Id.* at 31.  Specifically, the Department determined that the nail technicians were effectively a component of or

---

[9] *Minelli* held that a claimant, who was already receiving UC benefits, was not rendered ineligible under Subsection 402(h) of the Law, 43 P.S. § 802(h), based on her performance of a consulting job totaling 22 hours over three days.  Subsection 402(h) of the Law most relevantly provides that "[a]n employe shall be ineligible for compensation for any week[] … [i]n which he is engaged in self-employment."  43 P.S. § 802(h).

connected to Owner's business of operating the Salon. Further, the Department observed that there was no testimony regarding the ability of the nail technicians to supply substitute workers, and it was clear that they did not own all of the assets they used in the endeavor or bore the full measure of financial risk.

Most importantly for our present purposes, the Department also determined that, while many of the disputed individuals had other employment, the evidence was insufficient to demonstrate that any of them had their own business or were performing their services for others. *Id.* at 27-32. The Department thus concluded that these circumstances were insufficient to demonstrate that the individuals were not dependent on the Salon for ongoing work or that they were customarily engaged in a trade or business as opposed to being engaged in isolated or sporadic jobs. *Id.* (relying upon, *inter alia*, *Minelli* and *Jia v. Unemployment Comp. Bd. of Review*, 55 A.3d 545, 548 (Pa. Cmwlth. 2012) (explaining that an employer must show "that the work was done for others, not just the employer, as part of an independent trade" in overcoming the statutory presumption of employment)).[10]

Based on the foregoing, and because both prongs of Subsection 4(l)(2)(B) must be met for a worker to qualify as an independent contractor, the Department denied the

---

[10] In the course of its analysis of the cleaning personnel, the Department commented that the Law "does not provide a blanket UC tax exemption for casual-type workers." Final Decision and Order of the Department, 6/16/2016, at 29 & n.21 (citing Subsection 4(l)(4)(3) of the Law, 43 P.S. § 753(l)(4)(3) (excluding from the term "employment" "[s]ervice not in the course of the employer's trade or business performed in any calendar quarter by an employe unless the cash remuneration paid for such service is fifty dollars or more and such service is performed by an individual who is regularly employed by such employer to perform such service")). The Department reasoned that it did not appear that the three cleaning personnel would meet the exemption's monetary cap.

It is worth noting that Subsection 4(l) contains myriad provisions for what does and does not constitute "employment," of which Subsection (4)(l)(2)(B) and Subsection 4(l)(4)(3) are a part. *See* 43 P.S. § 753(l). Though not at issue here, Subsection 4(l) also excludes certain "domestic service," *see id.* § 753(l)(3)(H), (4)(2).

Salon's reassessment petition as to the five disputed individuals. The Salon then appealed the Department's determination to the Commonwealth Court, arguing that the Department erred in concluding that the five individuals were employees of the Salon because they did not actually perform their services in other locations. The Salon contended that, under a correct application of the self-employment test, a worker must merely be able to work for others, and not actually do so.

In a published, split opinion, a three-judge panel of the Commonwealth Court reversed the Department's order to the extent that it denied the Salon's reassessment petition as to the five disputed workers. *A Special Touch v. Dep't of Labor & Indus.*, 192 A.3d 1238 (Pa. Cmwlth. 2018). Rather than engage in a statutory construction analysis, the Commonwealth Court viewed the same three-part test identified by the Department from *Viktor* to govern whether an individual meets the second prong of Subsection 4(l)(2)(B), and it faulted the Department for interpreting *Minelli* as "adding" to that test. The Commonwealth Court further explained that *Minelli* did not hold that an individual must actually work for multiple clients to be self-employed, reasoning that the fact that "an individual may be unsuccessful in obtaining other clients or is simply satisfied working for a single client or at a single location does not transform an independent contractor relationship into that of employer/employee." *Id.* at 1243. The court additionally observed that *Minelli* did not hold that one who works only on occasion is an employee.

The Commonwealth Court then reasoned that, in any event, this case was not "a *Minelli* case." *Id.* The court explained that *Minelli* arose under Subsection 402(h) of the Law, *supra* at page 7 n.9, which, according to the court, renders a claimant receiving UC benefits ineligible if the claimant "sets up a business" and, unlike Subsection 4(l)(2)(B), has "nothing to do with the nature of the claimant's employment relationship with her separating employer." *A Special Touch*, 192 A.3d at 1243. Notwithstanding that

Subsection 402(h) more precisely specifies that a claimant is ineligible for benefits for any week that he or she is engaged in "self-employment," and that the *Minelli* court relied upon Subsection 4(l)(2)(B) of the Law to define that term, the court in the matter *sub judice* reasoned that *Minelli*'s analysis is used "where the Department disqualifies a claimant receiving benefits from further compensation under Section 402(h) of the Law." *Id.* at 1244.

The court explained that here, none of the workers at the Salon is receiving UC benefits as a result of a separation from prior employment. Rather, the issue concerned an OUCTS audit of a putative employer's business operations, and whether the disputed individuals are employees of the Salon and subject to UC taxes. For these reasons, the court found *Minelli* to be inapposite. *Id.* at 1243-44.

The Commonwealth Court then criticized the Department's reliance upon *Jia*, *see supra* at page 8, in its analysis. The court observed that the claimant in *Jia*, a software programmer working under a consultant agreement, was eligible for benefits after his services were no longer needed because, *inter alia*, he did not and could not do programming for any other customer because his time was fully consumed by a single employer. The Commonwealth Court contrasted *Jia* with *Stauffer v. Unemployment Comp. Bd. of Review*, 74 A.3d 398 (Pa. Cmwlth. 2013), where a claimant who provided childcare to a mother of three children was determined to be self-employed because the mother did not control the time, place, or manner of the claimant's work and the claimant was free to perform the same work for others, even though she did not actually provide childcare for others.

The Commonwealth Court pointed out that in *Stauffer*, the "fact that [the c]laimant did not happen to do any babysitting for others during the period in question [wa]s immaterial," and that the pertinent inquiry was whether the putative employer either

directly, or by the hours of work assigned, prohibited the worker from performing services for others. *A Special Touch*, 192 A.3d at 1245 (quoting *Stauffer*, 74 A.3d at 407). The Commonwealth Court concluded that the five disputed individuals were analogous to the claimant in *Stauffer* because they worked at the Salon at times of their choosing and were free and able to work for others.

In light of the foregoing, the Commonwealth Court held that, based on the totality of the circumstances, the five workers at issue were customarily engaged in an independently established trade or business under the second prong of Subsection 4(l)(2)(B) of the Law and, therefore, were independent contractors. The Commonwealth Court highlighted that the individuals were able to work for more than one entity; were not limited by the nature of their work for the Salon, or their hours, to a single employer; were not dependent upon the Salon's existence for ongoing work; and were able to refuse assignments. Accordingly, the court held that the Department erred in denying the Salon's reassessment petition as to those five individuals.

Judge McCullough dissented from the majority's conclusion that the three cleaning personnel were independent contractors. Judge McCullough opined that the majority's decision as to those individuals was made in disregard of the "customarily engaged" statutory requirement, the Commonwealth Court's precedent recognizing the necessity of meeting that requirement, and this Court's directive to construct the term "employment" broadly to provide the largest possible coverage of employees. *Id.* at 1246-48 (McCullough, J., dissenting) (quoting *Viktor*, 892 A.2d at 795).

Judge McCullough noted that *Viktor*, which she opined did not address the "customarily engaged" requirement, recognized that "a worker can be considered an independent contractor only if he or she is in business for himself or herself." *Id.* (McCullough, J., dissenting) (quoting *Viktor*, 892 A.2d at 798) (emphasis omitted). Judge

McCullough also criticized the majority for "creat[ing] two different tests to determine whether an individual is an independent contractor" depending upon whether the question arises in UC tax or UC benefits cases. *Id.* at 1248 (McCullough, J., dissenting). Based on her interpretation of the law and the facts of record, Judge McCullough determined that the Department correctly found that there was insufficient evidence to conclude that the three cleaning personnel were independent contractors.

## II. Issue

The Department petitioned this Court for review, which we granted to decide the following question, as phrased by the Department:

> Should this Court exercise its supervision to provide the controlling interpretation of the phrase "customarily engaged in an independent business" to define "employment" in the … Law in order to resolve the inconsistent interpretations of the Commonwealth Court as to a definition that is fundamental to the administration of the [UC] program and thus of significant public importance?

*A Special Touch v. Dep't of Labor & Indus.*, 204 A.3d 368 (Pa. 2019) (*per curiam*). This issue requires us to engage in statutory interpretation. As such, it presents a question of law, for which our standard of review is *de novo*, and our scope of review is plenary. *Berner v. Montour Twp. Zoning Hearing Bd.*, 217 A.3d 238, 245 (Pa. 2019).

## III. Arguments

The Department contends that in all UC cases the proper analysis concerning whether a worker is "customarily engaged" in an independent trade or business requires an inquiry into whether the putative employer has shown that the worker either actually performs the same services for others through that independent business or actively holds himself out to perform those services for others through that independent business, not merely that the worker is able to do so. The Department cites a litany of Commonwealth Court opinions in support of its position, noting that they focus on the past and present by assessing the ongoing services performed by the worker, not on whether

there is a hypothetical future ability to establish an independent business. Department's Brief at 18-21 (citing, *inter alia*, *Minelli* and *Jia*, *supra*). The Department contends that, in this case, it correctly found that the five disputed workers were employees of the Salon under Subsection (4)(l)(2)(B) because there was no record evidence that they provided the same services for others through an independent business or actively held themselves out to perform those services for others through that independent business.

The Department further claims that the Commonwealth Court erred in concluding that the analysis of the customarily engaged prong set forth in *Minelli*, a case involving the disqualification of a claimant from benefits that she was already receiving under Subsection 402(h) of Law, does not apply in UC tax cases like this one. The Department highlights that Subsection 402(h) of the Law disqualifies a claimant from benefits for any week in which the claimant is self-employed, a term which is not separately defined under Subsection 402(h), but is rather defined by using the same two-pronged analysis derived from Subsection (4)(l)(2)(B) and expounded upon herein. According to the Department, the Commonwealth Court thus effectively derived two different tests from the same statutory provision, depending upon which context--UC benefits or UC tax--the statute is being used in to determine whether a worker is "customarily engaged" in an independent trade or business: (1) whether a worker "could be" so engaged in UC tax cases, and (2) whether a worker "is" so engaged in UC benefits cases. The Department argues that, given that the Law provides only a single definition to assess self-employment in both the UC tax and UC benefits context under Subsection (4)(l)(2)(B), the Commonwealth Court's opinion injects confusion into this provision of the Law.

The Department further contends that the Commonwealth Court's interpretation violates the legislative intent behind the Law. The Department argues that the Law is to be construed liberally to provide the broadest possible benefits to claimants and that its

conditions absolving an employer from UC tax liability and denying benefits to claimants are to be strictly construed in favor of workers. *See id.* at 26-27 (quoting *Chamberlain v. Unemployment Comp. Bd. of Review*, 114 A.3d 385, 395 (Pa. 2015) ("[T]he provisions of the [Law] must be liberally construed to provide the broadest possible benefits to those who experienced forced unemployment."); *C. A. Wright Plumbing Co. v. Unemployment Comp. Bd. of Review*, 293 A.2d 126, 127 (Pa. Cmwlth. 1972) ("The courts of this Commonwealth have strictly construed the conditions which govern in cases where an employer alleges that he is not liable for the payment of [UC] tax or that a former worker is not eligible for [UC] benefits.")). The Department claims that the Commonwealth Court's "could be customarily engaged" analysis focusing on the worker's future, hypothetical ability to establish an independent business will result in denying benefits and eliminating UC tax liability in an overly broad manner while also increasing instances of worker misclassification.[11]

Finally, the Department argues that the Commonwealth Court's interpretation violates various principles of statutory construction and, in particular, ignores the express language of Subsection (4)(l)(2)(B). The Department claims that the phrase "customarily engaged" is not ambiguous. Department's Brief at 31 (quoting *Staffmore, LLC v. Unemployment Comp. Bd. of Review*, 92 A.3d 844, 847-48 (Pa. Cmwlth. 2014) (explaining that "'[c]ustomary' is defined as 'based on or established by custom' or 'commonly practiced, used, or observed;'" "'[c]ustom' means 'a usage or practice common to many or to a particular place or class or habitual with an individual' or 'repeated

---

[11] The Department additionally comments that the Commonwealth Court's analysis ignores the fact that part-time employment is covered "employment" under the Law. Department's Brief at 28 n.11 (quoting 43 P.S. § 753(j)(1) (defining "[e]mployer" as, *inter alia*, an entity that "employed or employs any employe in employment subject to this act for some portion of a day during a calendar year"). The Department explains that the fact that part-time employees could hypothetically work for others does not transform them into independent contractors.

practice;'" and "'[e]ngage' is defined as 'to employ or involve oneself; to take part in; to embark on'") (emphasis omitted)). The Department reiterates that the words "customarily engaged" look to the past and present by assessing the ongoing services performed by a worker, not a worker's future, hypothetical ability to establish an independent business. Thus, according to the Department, the plain language does not support the Commonwealth Court's interpretation.[12]

The Salon counters that, in UC tax cases, analysis of the "customarily engaged" prong of Subsection (4)(l)(2)(B) requires a determination of whether an individual is merely capable of performing services for more than one person. Beginning with the Law's provisions, the Salon notes that each "employer" must pay contributions to the fund, 43 P.S. § 781, and that "employer" is defined as a person or other entity who "employs any employe in employment subject to this act." *Id.* § 753(j)(1). The Salon contends that, while the question of whether an individual provides services in "employment" under Subsection (4)(l)(2)(B) governs the analysis here, Subsection 753(j)(1)'s definition of "employer" limits the inquiry into an individual's employment status for UC tax purposes to an examination of the relationship between the putative employer and the individual worker only, not any third party to which the individual may also provide services. The Salon argues that if the Legislature intended third parties to be involved in the

---

[12] Philadelphia Legal Assistance; Community Legal Services, Inc.; and National Employment Law Project have filed an *amici curiae* brief on behalf of the Department. Similar to the Department, *Amici* contend that the "customarily engaged" prong in Subsection (4)(l)(2)(B) of the Law requires an employer to show not merely that the worker "could" work for others, but that a worker has an ongoing independently established enterprise existing separate and apart from the employer that would survive upon the worker's separation from the employer. *Amici* echo and expound upon the arguments made by the Department in support of their position, highlighting the harm that results to workers, particularly those in low wage jobs, as well as the Law and UC system under the Commonwealth Court's contrary interpretation.

determination of an individual's status as an employee or independent contractor, it would have included language in the statute to that effect.

The Salon adds that, while the Law is to be construed liberally to provide the broadest possible benefits to claimants, statutory provisions imposing a tax are to be strictly construed in favor of the taxpayer, a principle this Court has noted in the UC context. Salon's Brief at 19 (citing, *inter alia*, *Wedner v. Unemployment Comp. Bd. of Review*, 296 A.2d 792, 796 (Pa. 1972) ("[I]t is to be remembered that the [UC] Law is a remedial statute, and, excepting the sections imposing taxes, its provisions must be liberally and broadly construed..."); 1 Pa.C.S. § 1928(b)(3) (providing that statutory provisions imposing taxes are to be strictly construed)). Thus, according to the Salon, the Department cannot expand "the penal application of the [Law] on the basis of the remainder's remedial nature." *Id.* at 19-20.

The Salon also argues that this Court decisively interpreted the meaning of the second prong of Subsection (4)(l)(2)(B) in the context of a UC tax case in *Viktor*, where the Court concluded that, *inter alia*, the individuals involved met that second prong because they had the "ability to perform their services for more than one entity, including competitors, with no adverse consequences." *Viktor*, 892 A.2d at 801-02. Echoing the rationale of the Commonwealth Court below, the Salon argues that the Department erroneously relied on *Minelli,* a benefits case, to supplement *Viktor*. The Salon argues that under the benefits provision of Subsection 402(h) of the Law at issue in *Minelli, see supra* at page 7 n.9, the focus of the inquiry is on the putative employee, who has first-hand knowledge of all of the relationships he may have with third parties, rather than on the nature of the relationship between the putative employer and employee as is the focus in UC tax cases.

The Salon further contends that, in contrast, requiring an analysis of third party relationships for determining an individual's status for UC tax purposes would be absurd, as it would "bas[e] the independent contractor determination not on the relationship between the individual and the presumed employer," and put the putative employer in a "continual state of flux based upon whether or not at any given time […] the individuals who perform work for the putative employer choose (or choose not) to perform such work for third parties." Salon's Brief at 15-16 (emphasis omitted) (quoting *Stage Rd. Poultry Catchers v. Dep't of Labor & Indus.*, 34 A.3d 876, 892 (Pa. Cmwlth. 2011)). Additionally, according to the Salon, an employer would merely have to create a third party for whom the individual would also provide services to satisfy the test. Arguing that adoption of the Department's interpretation in UC tax cases would provide little benefit while having several negative consequences, the Salon specifically notes that the Department's interpretation would, *inter alia*, (1) impose increased burdens on both the putative employer and the individual seeking independent contractor status and fundamentally change the manner in which people conduct their businesses; (2) place undue weight on the consideration of whether the individual works elsewhere, thereby oversimplifying the analysis to the detriment of the other factors and violating statutory construction principles; and (3) do damage to prior precedent.

The Salon also argues that, while the Department takes issue with the proliferation of two standards for use in two distinct contexts under the Law, the only real difference in application of the "customarily engaged" prong of Subsection (4)(l)(2)(B) is the degree of strictness with which the standard is applied.[13] The Salon adds that courts have appropriately applied the second prong of Subsection (4)(l)(2)(B) with varying degrees of

---

[13] The Salon argues, in the alternative, that adoption of different tests derived from the same statutory language for different factual scenarios is well within the province of this Court.

strictness as the circumstances mandate, and that the Commonwealth Court has consistently required more stringent proof showing self-employment in the UC benefits context. *See, e.g.*, *Minelli* and *Jia.* The Salon contends that any alleged inconsistencies in the decisions of the Commonwealth Court are simply due to the fact that a multifactor test renders no single factor dispositive. The Salon also argues that, under the proper analysis of the customarily engaged prong for UC tax cases, which includes a determination of whether an individual is able to provide the same services to others, the Commonwealth Court correctly determined that the disputed individuals here were independent contractors based on the facts of record.

In reply, the Department generally contends that the Salon's interpretation is not supported by statutory construction principles and the manner in which the Law is to be construed given its remedial purpose and the burdens it imposes on employers. The Department also challenges the Salon's claim that this Court definitively ruled on the meaning to be given to the phrase "customarily engaged" in *Viktor*, arguing that the Salon's assertion in this regard is belied by both that case and *Minelli*. Department's Reply Brief at 7-8 (quoting *Minelli*, 39 A.3d at 598 ("[The customarily engaged] element was not discussed in *Viktor* … because the persons found to be independent contractors … were clearly engaged in ongoing business activities…")). The Department claims that, while this Court addressed the second prong of Subsection (4)(l)(2)(B) in *Viktor*, we specifically addressed whether the individuals were truly independent from the putative employers and did not explicitly interpret the meaning of the phrase "customarily engaged" because that element was not in dispute.[14]

---

[14] The Department also noted its position on *Viktor* in its initial brief, further observing that we commented on the requirement in *Department of Labor and Industry v. Aluminum Cooking Utensil Company*, 82 A.2d 897 (Pa. 1951), a UC tax case in which we observed that a number of the workers involved "can and do engage in similar work for others" in analyzing whether those workers were independent contractors. *Id.* at 899. The

## IV. Discussion

Before we begin our analysis, we address the disputed import of our decision in *Viktor.* In *Viktor*, six limousine companies appealed Department decisions characterizing limousine drivers as employees and imposing UC taxes on the companies. There, the Court addressed whether the individual drivers were independent contractors under Subsection (4)(l)(2)(B) of the Law. In arguing to the Court that the drivers were employees, the Department claimed that the drivers were not customarily engaged in an independently established business under the second prong of Subsection 4(l)(2)(B) given that the drivers lacked a proprietary interest in the businesses; specifically, *inter alia*, the drivers did not alone suffer the risk of loss if expenses exceeded income because they did not own, insure, or maintain the limousines.

The Court rejected the Department's contention, concluding that Subsection 4(l)(2)(B) did not require a finding of a proprietary interest based on ownership of assets or sharing in risk. *Viktor*, 892 A.2d at 801. In *Viktor*, the Court made clear that its analysis specifically turned on the interpretation of the word "independently" as used in that subsection. *See id.* at 794 ("The relevant word that we must analyze with respect to determining whether [the d]rivers satisfied the second prong of the test is 'independent.' … It is the word 'independently' that engenders the instant dispute between the parties ..."). Thus, while it is true that the Court generally noted that the case concerned application of the second prong of Subsection(4)(l)(2)(B) (*i.e.,* whether the limousine drivers were "customarily engaged in an independently established trade, occupation, profession or business"), it is readily apparent that the "customarily engaged" requirement was not squarely at issue in *Viktor* as it is here.

---

Department argues, however, that because the workers were in fact engaging in similar work for others, we did not reach whether the phrase "customarily engaged" extends to workers who are not actually performing similar services for others.

Additionally, the Salon correctly observes that, in concluding that the drivers at issue were independent contractors, the *Viktor* Court observed that the drivers could, and many in fact did, perform their services for other companies. *Id.* at 795-802. These observations, however, were clearly made in relation to the Court's analysis of the discrete issue before the Court noted above, namely, whether the business of the drivers was established "independently" from the limousine companies. *See, e.g.*, *id.* at 796-97 ("As indicated by the Final Decisions of the Department, [the d]rivers could have offered or did offer their services to others. The businesses of [the d]rivers were not established only for the purpose of the work of a particular [employer] taxpayer."). Further, there was no dispute whatsoever in *Viktor* concerning whether the drivers were required to be involved in providing their services to others in actuality, as opposed to hypothetically, to demonstrate that the drivers were operating "independently" or otherwise acting as independent contractors for purposes of the second prong of Subsection (4)(l)(2)(B) as is the case here. Thus, for these additional reasons, we do not find *Viktor* to be controlling.[15]

Having determined that this case indeed presents an issue of first impression, we begin our analysis. At the outset, we note that it is undisputed that the only provision at issue in this matter is Subsection (4)(l)(2)(B) of the Law and that it provides the test for determining whether the workers involved are independent contractors or employees for purposes of assessing UC taxes against the Salon. Thus, this case presents a matter of how to interpret that provision, which again provides, in relevant part:

> Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is shown to the satisfaction of the department that-- … (b) as to such services such

---

[15] We reach the same conclusion as to our decision in *Aluminum Cooking Utensil Company*. Like *Viktor*, this case did not involve a dispute over the meaning of the phrase "customarily engaged" or otherwise concern whether one must actually, as opposed to hypothetically, be involved in providing his or her services to others to be considered an independent contractor under Subsection 4(l)(2)(B) of the Law.

individual is customarily engaged in an independently established trade, occupation, profession or business.

43 P.S. § 753(l)(2)(B). As noted, we have been called upon specifically to discern the meaning of the phrase "customarily engaged."

As in all matters of statutory construction, the Statutory Construction Act (Act), 1 Pa.C.S. §§ 1501-1991, guides our analysis. The Act directs that the object of all statutory interpretation is to ascertain and effectuate the intent of the General Assembly, which is best indicated by the plain language of the statute. *In re Bd. of Comm'rs of Cheltenham Twp.*, 211 A.3d 845, 853 (Pa. 2019). In this respect, the rules of statutory construction mandate that "[w]ords and phrases shall be construed according to ... their common and approved usage." 1 Pa.C.S. § 1903(a). It is only when the statutory language at issue is ambiguous that we look beyond it to the various factors listed in Subsection 1921(c) to ascertain its meaning. *Barnard v. Travelers Home and Marine Ins. Co.*, 216 A.3d 1045, 1051 (Pa. 2019). Further, the Act directs that, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b).

In addition to the above, we keep the following legal principles concerning the Law in mind. It is well settled that the Law "presumes that when individuals perform services for wages they are employees." *Viktor*, 892 A.2d at 792. Once the Department shows "that an individual is performing services for wages, as that term is defined under the [Law], the burden shifts to the taxpayer to bring itself within" an exception. *Comm., Bureau of Emp. Security v. Hecker & Co.*, 185 A.2d 549, 552 (Pa. 1962). With respect to Subsection 4(l)(2)(B), the taxpayer must satisfy both prongs to exclude itself from the Law's coverage. *Id.*

Further, "it is to be remembered that the … Law is a remedial statute, and, excepting the sections imposing taxes, its provisions must be liberally and broadly

construed so that its objectives (insuring that employees who become unemployed through no fault of their own are provided with some semblance of economic security) may be completely achieved." *Wedner*, 296 A.2d at 796. In this respect, we have observed that the Legislature intended the Law to cover more than those individuals "who would be considered employes under the common law, and to include, as it expressly states, 'all service performed for remuneration', subject only to the exceptions specified in other provisions of the act." *Aluminum Cooking Utensil Co.*, 82 A.2d at 898-99.

We begin our analysis with the plain meanings of "customarily" and "engaged," both of which we gather from their dictionary definitions. Black's Law Dictionary defines the word "customarily" to mean "usually, habitually, according to the customs; general practice or usual order of things; regularly." Black's Law Dictionary 385 (6th ed. 1990). While Black's Law Dictionary does not define the term "engaged," it does define the term "engage" to mean "[t]o employ or involve one's self; to take part in; to embark on." *Id.* at 528. Viewed together, then, these definitions make it clear that the meaning of the phrase "customarily engaged" requires an individual to be "usually," "habitually," or "regularly" "employed" or "involved" in activity; or "employed" or "involved" in activity "according to the customs," "general practice," or "usual order of things."

Applying the above definition in this context, we read Subsection (4)(l)(2)(B) to be unambiguous in requiring a putative employer to show that an individual is actually involved in an independent trade, occupation, profession, or business in order to establish that the individual is self-employed under the second prong of Subsection (4)(l)(2)(B). We read nothing in the definitions of either "customarily" or "engaged," or in Subsection (4)(l)(2)(B) beyond this crucial phrase, to signal that the phrase requires only that an individual be capable of being involved in an independently established trade, occupation, profession, or business. Indeed, we view Subsection (4)(l)(2)(B)'s use of the word "is"

before the phrase "customarily engaged" to lend further credence to our interpretation. *See* 43 P.S. § 753(l)(2)(B) (requiring a putative employer to establish that an individual "is customarily engaged in an independently established trade, occupation, profession or business" as to the services provided to the putative employer by the individual).

As for the Salon's position, we are constrained to reject it because it is contrary to the plain language of the statute. Accordingly, given what we view as the plain meaning of the statutory mandate, we decline the Salon's invitation to look to other principles of statutory construction or other provisions of the Law for interpretive guidance. Nor do we agree with the Salon's contention that our interpretation would be overly burdensome, lead to absurdity, or otherwise do damage to the Law. Indeed, the Salon has failed to persuade us that our interpretation imposes a burden greater than that which is already imposed on employers under the Law.

While we understand the burdens imposed on employers under our interpretation, to require that an individual merely be capable of performing their services for others would be to ignore the plain language of the statute and render the "customarily engaged" requirement meaningless. Further, we are persuaded by the Department that interpreting the "customarily engaged" requirement as the Salon would have us read it imposes too great a risk that workers who are not truly independent contractors would fall within Subsection 4(l)(2)(B)'s purview, enabling employers to avoid paying UC taxes.[16]

---

[16] We find it significant that the UC tax contributions paid by employers are used to fund the UC Fund from which UC benefits are paid. *See*, *e.g.*, 43 P.S. § 753(g) (defining "contributions" to mean "the money payments required to be paid into the [UC] Fund by employers, with respect to employment, which payments shall be used for the creation of financial reserves for the payment of compensation as provided in this act"); *id.* § 781 (relating to, *inter alia*, the payment of contributions by employers and employes); *id.* § 841(a) (creating the UC Fund and providing that, with exceptions, "[a]ll contributions paid by employers and employes … shall be paid into the [UC] Fund").

Having determined that the phrase "customarily engaged" requires actual, rather than hypothetical, involvement in an independent trade or business, we are careful to emphasize that our interpretation does not equate "actual involvement" to a requirement that an individual "actually perform his or her services" for third parties during a given time period. In other words, we agree with the notion that an individual can be an independent contractor who "is simply satisfied working for a single client or at a single location" depending on the circumstances. *A Special Touch*, 192 A.3d at 1243. Similarly, and like the Commonwealth Court below, we disagree that "one who works only on occasion is necessarily an employee." *Id.*

Thus, the analysis under this requirement does not simply turn on the extent to which an individual actually provides his or her services to either the putative employer or third parties, although these considerations are certainly relevant. Rather, the "customarily engaged" language can encompass more activity than actually providing services for others, so long as it is demonstrated that the individual is in some way actually involved in an independently established trade or business. In this respect, we agree with the Department that circumstances demonstrating that an individual is actively holding himself out to perform services for another, such as through the use of business cards or other forms of advertising, even if not actually performing those services during a particular time period at issue, are also relevant to the analysis.[17]

In light of the above, we recognize that determining whether an individual is an employee or independent contractor is often difficult in practice. The analysis of whether a person meets Subsection 4(l)(2)(B) is dependent on multiple statutory factors, of which

---

[17] Thus, we reject the Salon's suggestion that our interpretation would allow the self-employment determination to be subject to the whim of the putative employee (by choosing to work or not work for third parties at any given time) or employer (by somehow incorporating a third party for whom the individual would also provide services at any given time).

the "customarily engaged" requirement is merely one, and necessitates a fact-intensive inquiry. *See* 43 P.S. § 753(l)(2)(B) (providing that "[s]ervices performed by an individual for wages shall be deemed to be employment" unless it is shown that: "(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business"); *Viktor*, 892 A.2d at 801 ("[T]he unique facts of each case must be examined in order to resolve the question of employee versus independent contractor status."). Further, analysis of one statutory requirement may be informed by the same facts and considerations that pertain to other statutory requirements. For instance, whether a person works for third parties can be relevant not only to whether he or she has an "independently" established trade or business, *Viktor*, but also to whether he or she "customarily engages" in that trade or business as we have concluded here.

Notwithstanding these challenges, we, like Judge McCullough, find the following observation made in *Viktor* to be particularly elucidating: "a worker can be considered an independent contractor only if he or she is in business for himself or herself." *Viktor*, 892 A.2d at 798. We believe that application of Subsection (4)(l)(2)(B)'s provisions and this Court's interpretations thereof render the task of determining an individual's employment status surmountable.

Finally, having discerned the proper definition of the "customarily engaged" requirement, we turn to application of that definition to this case. As noted, the Department found that, while many of the workers performed work outside of the Salon, none of them were providing their nail or cleaning services as a part of their own business

or for other businesses.[18] Further, nothing in the Department's findings indicates that the individuals were holding themselves out has having their own businesses or otherwise indicated that they were actually involved in an independently established business. Thus, the evidence was insufficient to support a finding that the disputed individuals were "customarily engaged" in an independently established trade or business for purposes of Subsection 4(l)(2)(B) of the Law.

## V. Conclusion

For the reasons discussed, we hold that the phrase "customarily engaged" as used in Subsection 4(l)(2)(B) of the Law requires that an individual actually be involved, as opposed to merely having the ability to be involved, in an independently established trade, occupation, profession, or business.[19] Based on this definition, the Department correctly

---

[18] The Department found that V.D., one of the nail technicians, had only provided her services at another location during the beginning of her time working for the Salon. Thereafter, her arrangements at the other facility ended. S.M., the other nail technician, had not provided her services elsewhere aside from a few home visits in the past for a client who had surgery. She had previously worked as a server at Cracker Barrel and the VFW. As for the cleaning personnel, G.S. additionally worked at an M&M factory and performed "odds and ends" jobs, C.S. was a college student who also worked at Red Robin and possibly another place, and B.G. worked at a temp agency in addition to the Salon. Notably, none of the cleaning personnel was found to have provided their cleaning, maintenance, and/or babysitting services beyond those provided at the Salon.

[19] The concurrence agrees with the standard we set forth today but posits that it instead emanates more directly from the "independently established trade" portion of the statute. In doing so, the concurrence faults us for limiting the scope of the question presented. Notwithstanding the broad phrasing of the issue upon which we granted review, as noted, the parties specifically dispute whether an individual must actually work, or actively hold himself out to work, for others, as opposed to being merely capable of doing so, for purposes of satisfying the second prong of Subsection 4(l)(2)(B). The Department argues that an individual must actually work for others, or actively hold himself out to work for others, by virtue of the "customarily engaged" language of Subsection 4(l)(2)(B), which we have never addressed directly. In view of the nature of the specific dispute before us, we agree that Subsection 4(l)(2)(B)'s use of "customarily engaged," together with its use of "is" preceding that phrase, is the appropriate statutory basis upon which to resolve this dispute. Nonetheless, like the concurrence, we acknowledge the overlap between the

concluded that the three cleaning personnel and two nail technicians at issue in this case were not "customarily engaged" in an independently established business for purposes of that subsection. As the Commonwealth Court erred in reversing the Department's determination on that basis, we reverse the order of that court and reinstate the Department's order denying the Salon's reassessment petition as to those employees.

Justices Donohue, Dougherty and Wecht join the opinion.

Chief Justice Saylor files a concurring opinion in which Justices Todd and Mundy join.

---

"customarily engaged" and "independently established trade" elements of the statute. *See supra* at page 25.